Harry MARNIE, Petitioner

v.

**WORKERS' COMPENSATION APPEAL BOARD (COMMONWEALTH OF PA/DEPT. OF ATTORNEY GENERAL), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 13, 2012.

Decided June 7, 2012.

Michael G. Dryden, Philadelphia, for petitioner.

Sheilah A. Tone, Scranton, for respondent Commonwealth of PA/Dept. of Attorney General.

BEFORE: COHN JUBELIRER, Judge, and SIMPSON, Judge, and COLINS, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Harry Marnie (Claimant) petitions for review of the July 26, 2011 Order of the Workers' Compensation Appeal Board (Board) that affirmed the order of a Workers' Compensation Judge (WCJ) denying Claimant's Petition for Review of Compensation Benefits Offset (Review Petition). The Board held that the actuarial methodology of the State Employees' Retirement System (SERS) presented on behalf of the Commonwealth of Pennsylvania/Department of Attorney General (Employer) was legally sufficient to establish Employer's offset/credit (offset) in accordance with the Notice of Workers' Compensation Benefit Offset (Notice of Offset). (Notice of Offset, R.R. at 1a–2a.) On appeal, Claimant argues that the SERS actuarial methodology does not support the offset as a matter of law because it does not calculate the offset of benefits "to the extent funded by the employer" as required by Section 204(a) of the Workers' Compensation Act (Act).[1]

Claimant sustained an injury on February 23, 1998, in the course of employment and for which he subsequently received workers' compensation benefits pursuant to an Agreement for Compensation. Claimant began receiving a disability pension from SERS on January 14, 2005. Employer notified Claimant through the Notice of Offset that it would offset, or reduce, Claimant's workers' compensation benefits by the amount of SERS benefits attributable to Employer. On March 21, 2006, Claimant filed the Review Petition challenging Employer's entitlement to the amount of the offset. Before the WCJ, Claimant presented the testimony of his actuary, Frank Iannucci, in support of the Review Petition. In opposition, Employer presented the testimony of SERS Director of Benefits Determination, Linda Miller, and SERS actuary, Brent Mowery. The WCJ found the testimony of Ms. Miller and Mr. Mowery to be clear, unequivocal, logical and coherent, demonstrative of prudence in the management of the SERS Plan, and more persuasive than the testimony of Claimant's actuary, Frank Iannucci. The WCJ credited the testimony of Ms. Miller and Mr. Mowery to the extent there were any inconsistencies with Mr. Iannucci, and held that Employer met its burden of establishing its entitlement to the offset as set forth in the Notice of Offset. (WCJ Decision, October 24, 2007, Findings of Facts (October 2007 FOF) ¶¶ 1–8, 20; Conclusion of Law ¶ 2.) Claimant appealed the WCJ's decision.

■ On appeal, the Board concluded that the WCJ did not err in determining that Employer was entitled to an offset, but concluded that the WCJ erred "in fully accepting [Employer's] actuarial evidence as presented." (Board Decision, August 28, 2008, at 7.) The Board remanded the matter to the WCJ to reopen the record as necessary. On remand, Mr. Mowery and Mr. Iannucci testified by depositions dated May 24, 2009 and October 2, 2009, respectively. The WCJ again credited Employer's actuarial evidence and denied Claimant's Review Petition. (WCJ Decision, January 19, 2010, Findings of Fact (Janu-

---

1. Act of June 2, 1915, P.L. 736, *as amended,*     77 P.S. § 71(a).

ary 2010 FOF) ¶¶ 6, 15, 25, Conclusion of Law ¶ 3.) Claimant appealed to the Board, which affirmed the WCJ, and held that the legal sufficiency of the evidence was governed by the Supreme Court's recent decision in *Department of Public Welfare v. Workers' Compensation Appeal Board (Harvey)*, 605 Pa. 636, 645, 993 A.2d 270, 276 (2010), and no error was committed. (Board Decision, at 8.) Claimant now appeals to this Court claiming that the formula used inaccurately attributes funds to Employer that should have been attributed to the Claimant in determining the amount of the offset.[2] Claimant requests that this Court reinstate Claimant's "benefits to the pre[-]offset level, with the payment of all past due benefits and" ten percent interest. (Claimant's Br. at 20.)

Section 204(a) of the Act provides that benefits afforded under the Act are subject to being offset by retirement benefits "to the extent funded by the employer directly liable for the payment of compensation" and that the pension plan benefits which are received by an employee "shall ... be credited against the amount of the [workers' compensation] award[.]" 77 P.S. § 71(a). The Board's regulations provide that "[i]n calculating the offset amount for pension benefits, investment income attributable to the employer's contribution to the pension plan shall be included on a pro rata basis." 34 Pa.Code. § 123.8(d).

SERS uses an actuarial formula to determine the extent to which Employer has funded its employees' SERS pensions.

(October 2007 FOF ¶ 14.) The credited actuarial formula derives

> the total present value of the employee's pension benefit through the use of actuarial assumptions. [T]he amount of the employee's actual monetary contributions ... [are] determined and ... an assumed investment rate of 8.5% is added to that amount. [T]he resulting figure is then subtracted from the total present value of the employee's pension, and [ ] the remainder is considered to be the portion of the employee's retirement benefit contributed by employer.

(October 2007 FOF ¶ 14.) However, Claimant contends that the SERS formula inaccurately attributes funds to Employer which should be attributable to employees. Specifically, Claimant argues that the SERS formula improperly credits Employer for the investment returns in excess of 4% on projected refunds to employees who will separate from state service before their retirement benefits have vested—the non-vesting employees. Noting that the SERS projected refunds include the 4% interest that is required by law,[3] Claimant argues that there still remains a difference between the actuarially projected refunds to the non-vesting employees that include the 4% interest and the SERS actuarially assumed investment rate of return of 8.5% on total accumulated contributions—a difference of 4.5% ("the retained investment returns"). Claimant contends that the retained investment returns must be isolated out of the Employer's portion of the offset calculation. Surmising that the retained

---

2. Our scope of review is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Horner v. Workers' Compensation Appeal Board (Liquor Control Board)*, 22 A.3d 1097, 1100 n. 4 (Pa.Cmwlth. 2011).

3. Section 5933(b) of the State Employees' Retirement Code (Retirement Code) provides that "[t]he members' savings account in total and the individual member accounts shall be credited with statutory interest." 71 Pa.C.S. § 5933(b). "Statutory interest" is defined as "[i]nterest at 4% per annum, compounded annually." Section 5102 of the Retirement Code, 71 Pa.C.S. § 5102.

investment returns should be attributable to employees rather than to Employer, Claimant contends that Employer's failure to exclude the retained investment returns from its offset calculations impermissibly credits Employer with contributions in violation of Section 204(a) of the Act. For this reason, Claimant concludes that Employer's actuarial evidence is neither competent nor legally sufficient.

In *Harvey*, the Supreme Court considered the similar, if not identical, issue of whether "the use of the actuarially assumed rate of return in the Section 204(a) offset calculations is inconsistent with the statutory limitation of the credit to the employee-funded portion of a pension." *Harvey*, 605 Pa. at 645, 993 A.2d at 276. The Supreme Court examined whether Section 204(a), as a matter of statutory construction, contemplated a precise allocation of actual, existing employer funding to specific pension accounts, thereby eschewing actuarial input. *Id.* at 653, 993 A.2d at 281. In its analysis, the Supreme Court cited *The Pennsylvania State University v. Workers' Compensation Appeal Board (Hensal)*, 911 A.2d 225, 232 (Pa. Cmwlth.2006), and affirmed this Court's position that, in the context of a defined-benefit plan, where an employer cannot provide evidence of actual contributions for the use of an individual member "the statute does not explicitly require an employer to prove the amount of its actual contributions" *Harvey*, at 645, 653, 993 A.2d at 276, 281. Further, noting that "the relevant offset provision focuses on the extent to which benefits are funded by the employer," the Supreme Court stated that Section 204(a) was ambiguous as to how the General Assembly "contemplated employer-funding would be assessed." *Id.* at 653, 993 A.2d at 281. As a result of this legislative ambiguity, the Supreme Court explained that it was appropriate to resort to tools of statutory construction, including

"consideration of the occasion and necessity for the statute, the object to be attained, the consequences of a particular interpretation, the contemporaneous legislative history, and administrative interpretations." *Id.* (citing Section 1921(c) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(c)). In examining these criteria, the Supreme Court concluded that the purpose of the Section 204(a) offset was to foster cost containment in the workers' compensation insurance area, noting that the General Assembly's "clear intention was to afford effective redress." *Id.* In fact, the Supreme Court stated that "the support by SERS, as the administrative agency charged with administering the state pension system, for the use of actuarial calculations to determine employer funding of pensions militates in favor of a construction allowing it." *Id.* at 654, 993 A.2d at 281–82. Accordingly, the Supreme Court "f[ound] nothing that precludes the sound use of actuarial principles in evaluating employer funding in defined-benefit pension plans." *Id.* at 654, 993 A.2d at 282.

Next, the Supreme Court examined whether the employer's expert and consultant testimony provided substantial evidence to support the WCJ's findings, reasoning that:

the employer's expert testimony was internally consistent, and the factual basis was provided, inter alia, in the form of investigations and reports performed by SERS's actuarial consultant. While the actuarial evidence contains an inherent predictive element, the arguments of Employer and its amici amply develop that such predictions are a staple of the discipline and a core component of defined-benefit pension-system valuation. *Accord* Jerry S. Rosenbloom, The Handbook of Employee Benefits 1232 (6th ed.2005) (explaining that "the very core

of the process of costing and funding defined retirement programs is the concept of actuarial present value. This involves computing how much money should be set aside today to pay certain benefits in the future."). This Court recognizes the practical necessity of expert opinion testimony in matters well beyond lay experience, and we hold that actuarial assumptions and calculations may form the basis for a reasoned determination of the employer-funded component of a defined-benefit pension.

*Id.* at 655–656, 993 A.2d at 282. In arriving at its holding in *Harvey*, the Supreme Court noted that "the WCJ properly credited the consultant's testimony that the nature of a defined-benefit plan impedes direct tracing and quantification of employer funding, and that actuarial science offers a rational alternative consistent with the nature of this type of plan." *Id.* The Supreme Court further noted that an employer may use actuarial evidence to establish the offset without the necessity of proving actual contributions and, "if the actuarial testimony is accepted as credible, it is legally sufficient to establish the extent of an employer's funding for offset/credit purposes." *Id.* (quoting *City of Philadelphia v. Workers' Compensation Appeal Board (Grevy)*, 968 A.2d 830, 839 (Pa.Cmwlth.2009)). In fact, in *Hensal*, we had recognized that "the extent to which an employer funded a particular employee's defined benefit pension can *only be determined by an actuarial formula.*" *Hensal*, 911 A.2d at 232 (emphasis added).

Recent decisions of this Court have reversed WCJ findings that an employer's actuarial evidence was not credible. In *School District of Philadelphia v. Workers' Compensation Appeal Board (Davis)*, 38 A.3d 992, 993 (Pa.Cmwlth.2011), this Court again analyzed *Harvey* and *Hensal* in reviewing a denial of an Employer's petition to review a benefit offset where the WCJ did not credit a portion of Employer's testimony that did not quantify the value or amount of the investment returns that may be retained in the fund after refunds have been paid to the non-vesting employees. We noted the difficulty faced by an employer in demonstrating the extent to which it funds an employee's pension in the context of a defined-benefit plan because "an employee's actual contributions do not determine the amount of monthly benefits a member will receive" when "the pension guarantees a fixed benefit level ... [and] the employer assumes the risks of investment, inadequate funding, and member longevity." *Davis*, 38 A.3d at 994 (quoting *Hensal*, 911 A.2d at 231). In reviewing the WCJ's rejection of the employer's actuarial evidence because of the WCJ's belief that the inclusion of the retained investment returns overstated the employer's contribution to the pension plan, we noted that there was no definitive evidence that the retained investment returns affected the contributions made by the employer to the fund as a whole and highlighted the testimony by employer's actuary that "the formulas employed already reflected a recognition of the impact of Retained Investment Returns remaining in the fund upon the termination of non-vesting employees." *Id.* at 996. We further noted that the employer had argued in *Harvey* that retained investment returns were not one of the three material sources of pension funding and the employer's actuarial consultant, deemed credible by the WCJ, was aware of the issues concerning the retained investment returns yet still concluded that the underlying methodology and offset were appropriate within a reasonable degree of actuarial certainty. *Id.* at 997. Therefore, we concluded in *Davis* that the WCJ erred by

overlook[ing] the fact that a primary goal of Section 204(a) of the Act, and the

actuarial methods the Supreme Court has approved, are designed not only to ensure that a claimant does not fund his own workers' compensation benefits, but also that an employer should not have to pay a Claimant, in essence, "double" compensation for his work-related injuries. The actuarial formula the Supreme Court accepted in *Harvey* seeks to arrive at the proper result by excluding other material and identifiable sources of fund contributors by determining actual contributions from those sources. Investment return income arising from those identifiable sources may lead to reductions in payment by an employer, but when the return on the Fund's investments is below four percent, or negative, an employer, not an employee, must bear the cost of such losses by increasing its contributions. The formula, as indicated in *Harvey*, also recognizes the imprecision inherent in the analysis.

*Id.* at 998. In *Glaze v. Workers' Compensation Appeal Board (City of Pittsburgh)*, 41 A.3d 190, 199–200 (Pa.Cmwlth.2012), another recent case of this Court involving pension benefit offset calculations in the context of a defined-benefit plan, the WCJ questioned whether the employer's calculations were based upon reliable data related to investment income of the pension fund and whether it was attributable only to Employer or, in some part, to the non-vesting employees. We concluded that, in the context of a defined-benefit plan, it was a fundamental error for the WCJ to reject Employer's testimony on the basis of Employer's inability to identify how much it contributed to any specific individual's pension benefits. *Id.* at 206–07.

■■ In *Harvey* and *Davis*, only Employer presented actuarial evidence, while in this case, the Claimant also presented his own actuarial evidence. However, the WCJ did not credit Claimant's actuarial evidence and, instead, credited Employer's actuarial evidence in support of the SERS methodology, including the manner in which SERS calculated Employer's pension offset.[4] (January 2010 FOF ¶ 25.) Therefore, the credited actuarial testimony in this case, which was very similar, if not identical, to the credited testimony in *Harvey*, supports the offset. As we recently explained, where an employer "established a prima facie case, and if Claimant desire[s] to challenge the prima case, Claimant [is] required to offer her own evidence demonstrating the materiality and relevance of her assertion that retention in the Fund of investment returns of non-vesting employees impacted the extent to which Employer contributed to Claimant's pension." *Davis*, 38 A.3d at 999–1000. The Claimant in this case did not do so.

SERS actuary, Mr. Mowery, testified about the nature of the SERS Plan as a defined-benefit plan, and presented the SERS methodology used to determine the extent of Employer's contributions to the Plan when calculating a pension offset pursuant to Section 204(a) of the Act. Mr. Mowery distinguished defined contribution plans from defined-benefit plans, explaining that defined contribution plans maintain separate accounts for each participant, with employees making contributions based on their pay that go into each employee's individual account and may include an employer contribution that remains clearly identifiable as it would go into the employee's separately maintained

4. "It is well settled in workers' compensation proceedings that the WCJ is the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight." *Daniels v. Work-* *ers' Compensation Appeal Board (Tristate Transport)*, 574 Pa. 61, 76, 828 A.2d 1043, 1052 (2003).

individual account. (WCJ Hr'g Tr., September 14, 2006, at 40–41, R.R. at 45a–46a.) Mr. Mowery further contrasted the defined-benefit plan from defined contribution plans, explaining that: Claimant's SERS pension plan, as a defined-benefit plan, has commingled assets without any accounting for the source of the inflow of dollars into the fund; whatever the source, all the dollars are mixed together or comingled into one huge fund; there is no tracking of dollars by individual participants; and what the employee will receive in pension benefits is not dependent upon the actual contributions and actual investment growth of the fund, with Employer bearing all the risk. (WCJ Hr'g Tr., September 14, 2006, at 41–43, R.R. at 46a–48a.)

Mr. Mowery explained that when a need arises to identify a split in the funding responsibilities, as it has in this case, it is very simple to make that determination in the context of a defined *contribution* plan, where it is as easy as looking up the record of any particular individual participant that is being maintained for that type of plan. (WCJ Hr'g Tr., September 14, 2006, at 43–44, R.R. at 48a–49a). However, as Mr. Mowery testified, when a defined-*benefit* plan is involved, it is quite a challenge because this type of plan involves a process based upon actuarial evaluations that must determine what is necessary to keep a large defined-benefit plan actuarially sound for the future. (WCJ Hr'g Tr., September 14, 2006, at 44–45, R.R. at 49a–50a). Mr. Mowery presented the offset methodology that has been adopted for many years by SERS when there is a need to determine an employee contribution, as there is in this case. (WCJ Hr'g Tr., September 14, 2006, at 49, R.R. at 54a.) He explained that this determination involves a three-step process: (1) an actuarial calculation of the total amount that will be sufficient to provide for the retiree's benefit as of the date of retirement (what SERS refers to as the total funding required as of the retirement date for a particular individual); (2) a calculation of employee contributions up until the date of retirement, including an 8.5% actuarially assumed investment return on those contributions; and (3) the difference between the Step 2 result and the Step 1 result is what is considered to be the employer's share of the funding of an individual's retirement benefit as of a retirement date. (WCJ Hr'g Tr., September 14, 2006, at 49–51, R.R. at 54a–56a.) He explained a fourth step involving a calculation to convert the Step 3 result into an annuity so that it can be used as an offset to the otherwise payable workers' compensation benefits. (WCJ Hr'g Tr., September 14, 2006, at 51, R.R. at 56a.) Mr. Mowery clarified that the 8.5% assumed rate of return also functions to neutralize the treatment of investment income from the high returns of 20% or more and the low returns of even negative 30%, as occurred in 2008, and thereby prevent extremely high or low offsets in any given year so that the participant is neither rewarded nor penalized in the context of a defined-benefit plan. (WCJ Hr'g Tr., September 14, 2006, at 52, R.R. at 57 a; WCJ Hr'g Tr., August 3, 2007, at 26, R.R. at 160a; Mowery Dep., May 29, 2009, at 15, R.R. at 216a.) Mr. Mowery noted that it is not proper to look back to *actual* returns on investment in the context of a defined-benefit plan, which would be inconsistent with the basic rule that the employer is responsible for the investment risk in a defined-benefit plan and, therefore, the employer will benefit or suffer accordingly. (WCJ Hr'g Tr., August 3, 2007, at 31, R.R. at 165a; Mowery Dep., May 29, 2009, at 18, R.R. at 219a.) Mr. Mowery concluded by stating that the use of actual returns is invalid as it would result in a non-neutral

calculation methodology that is contrary to the basic tenets of defined-benefit plans. (Mowery Dep., May 29, 2009, at 20, R.R. at 221a.) The WCJ credited this testimony. (October 2007 FOF ¶ 20; January 2010 FOF ¶ 25.)

The WCJ additionally credited the testimony of SERS Director of Benefits, Linda Miller. (October 2007 FOF ¶ 20; January FOF ¶ 25.) Ms. Miller testified regarding the manner in which the SERS methodology was applied to calculate the offset against Claimant's pension. Ms. Miller stated that Claimant's individual SERS benefit can only be determined pursuant to the SERS actuarial formula. (Miller Dep. at 5–6, R.R. at 242a.) Ms. Miller explained the formula as it applied to Claimant's benefit and offset amount, stating that the actuarial formula subtracts the specific amount Claimant contributed, plus an actuarially determined investment rate of return from the total value of the employee's actuarially determined lifetime benefit. (Miller Dep. at 12–27, R.R. at 243a–47a.)

The uncredited testimony of Claimant's actuary, Mr. Iannucci, (October 2007 FOF ¶ 20; January FOF ¶ 25), was that he would limit offset calculations to the employer's *actual* contributions and *actual* investment returns, (WCJ Hr'g Tr., May 24, 2007, at 22–35, R.R. at 98a–111a.), because "it is our position that we can actually calculate both of those numbers." (Iannucci Dep., October 2, 2009, at 7, R.R. at 236a.) However, even Mr. Iannucci admitted that he was aware that the actual rate of return in calendar year 2008 was minus 30% and he agreed with Employer that it would have to "kick in substantial additional funds at some point to cover that shortfall." (Iannucci Dep., October 2, 2009, at 18, R.R. at 239a.)

Notwithstanding the WCJ's crediting of Employer's actuarial testimony and the Supreme Court's acknowledgment in *Harvey*, 605 Pa. at 653, 993 A.2d at 281, that Section 204(a) "does not explicitly require an employer to prove the amount of its actual contributions," Claimant still contends that the WCJ committed an error of law in not isolating the retained investment returns. Claimant argues that Employer's failure to isolate retained investment returns improperly attributes employees' contributions to Employer and fails to competently establish an offset as a matter of law. Noting that this Court has previously corrected failures to isolate funding sources in *Pittsburgh Board of Education v. Workers' Compensation Appeal Board (Schulz)*, 840 A.2d 1078 (Pa.Cmwlth.2004), and *Pittsburgh Board of Education v. Workers' Compensation Appeal Board (Dancho)*, 834 A.2d 1242 (Pa.Cmwlth.2003), Claimant argues that the Board must be reversed as a matter of law.

In addressing Claimant's argument that the WCJ erred by failing to isolate the retained investment returns, we point out that in *Davis*, when the WCJ found the employer's experts were not credible because they did not isolate the retained investment returns and concluded that this "compel[led] rejection of [the actuary's] conclusion that the formula used by PSERS accurately establishe[d] Employer's contribution for offset," this Court determined that this basis for not crediting the employer's expert was erroneous. *Davis*, 38 A.3d at 993. We concluded that "the WCJ erred in basing his conclusion that Employer failed to satisfy its burden to prove its contribution to Claimant's pension on [the employer's actuary's] testimony that returns above four percent remain in the Fund." *Id.* at 999. The actuarial evidence that has been credited in this case provides an explanation for why the retained investment returns that are the

subject of Claimant's argument is not an actual fund that can be isolated in the context of a defined-benefit plan. The credited actuarial methodology presented by Mr. Mowery, the same methodology credited in *Harvey*, was found to be "clear, unequivocal, logical and coherent." (October 2007 FOF ¶ 20; January 2010 FOF ¶ 25.) Claimant's argument, premised upon attributing the retained investment returns to Employer as if there were an actual, existing fund, fails to appreciate the essence of a defined-benefit pension plan that "impedes direct tracing and quantification of employer funding [for which] actuarial science offers a rational alternative," *Harvey*, 605 Pa. at 655, 993 A.2d at 282, and refuses to acknowledge that the retained investment returns merely reflect an actuarial assumption.[5]

Finally, Claimant's reliance on *Schulz* and *Dancho* is misplaced because those cases involved whether the Commonwealth, in addition to the Board of Education, was an employer directly liable for compensation under Section 204(a). *Schulz*, 840 A.2d at 1081; *Dancho*, 834 A.2d at 1245. Moreover, to the extent Claimant argues there are any inconsistencies in the manner in which credits were addressed in *Schulz* and *Dancho*, they were addressed in the context of credits between two employers, and are notably inapposite after *Harvey*.

For the foregoing reasons, we conclude that Employer's credited, actuarial testimony provides substantial, competent evidence to support the WCJ's findings, is legally sufficient to establish the extent to which Employer funded Claimant's defined-benefit pension for purposes of the

offset and, therefore, satisfies Employer's burden of proving its entitlement to the offset in accordance with the Notice of Offset.

Accordingly, we affirm the Order of the Board.

### ORDER

**NOW,** June 7, 2012, the Order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby **AFFIRMED.**

---

5. We note that, in *Harvey*, an amicus argued that the difference between the 4% statutory interest rate and the assumed return rate of 8.5% "is not rightfully attributable to employer funding, yet it is credited to employers under the exclusion-based methodology for offset calculation." *Harvey*, 605 Pa. at 648, 993 A.2d at 277. However, the Supreme Court nonetheless upheld the offset based on the credited actuarial testimony.